2020 IL App (1st) 17-2690-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
March 3, 2020

No. 1-17-2690

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County, Illinois, |
| | ) | Criminal Division |
| v. | ) | |
| | ) | |
| PERCY MOORE, | ) | No. 16 MC 1201789 |
| | ) | |
| Defendant-Appellant. | ) | The Honorable |
| | ) | Clarence Burch, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.

Justices Coghlan concurred in the judgment.
Justice Pucinski specially concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence presented at trial was sufficient to permit the jury to infer that the defendant had the requisite *mens rea* and was therefore guilty beyond a reasonable doubt of criminal trespass to property. The prosecutor's comments attacking the credibility of the defendant's expert witness did not rise to the level of plain error. The trial court's questioning of the jury venire adequately complied with the requirements of Illinois Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 2    Following a jury trial in circuit court of Cook county, the defendant, Percy Moore, was found

guilty of misdemeanor criminal trespass to real property (720 ILCS 5/21-3(a)(3) (West 2016)) and sentenced to 180 days' imprisonment in the Cook County Department of Corrections (CCDOC or Cook county jail). The defendant appeals contending that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) in closing argument, the prosecutor improperly shifted the burden to the defense and encouraged jurors to ignore unrebutted expert testimony on the basis of assertions unsupported by the record; and (3) the trial court failed to adequately comply with Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)) in instructing the jury venire. For the reason that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        At the outset, we take judicial notice of the fact that the now 58-year-old mentally ill defendant is a repeat petty offender, who, since 2008, has recurrently entered the television news station building located at 190 North State Street, refusing to leave, until arrested. As a result, the defendant has been convicted repeatedly of misdemeanor criminal trespass to property and has spent numerous intermittent years in Cook county jail. See *People v. Moore*, 2011 IL App (1st) 091505-U (defendant convicted of criminal trespass to real property and sentenced to two years' probation for incident which occurred on February 7, 2018); *People v. Moore*, 2011 IL App (1st) 191504-U, *pet. for leave to appeal denied*, 962 N.E. 2d 487 (defendant convicted of criminal trespass to real property and sentenced to 180 days' imprisonment for incident on May 16, 2008); *People v. Moore*, 2019 Ill App (1st) 161117-U (defendant found guilty but mentally ill and convicted of to two counts of criminal trespass to property for incidents that occurred on March 26, and 27, 2015, and sentenced to 180 days' imprisonment and one year of probation).

¶ 5        In the instant case, the defendant was charged by complaint with misdemeanor criminal

trespass to land for his attempt to enter the same building on October 6, 2016. [1] The present complaint charged the defendant with "knowingly remain[ing] upon the land of ABC/WLS-TV" (hereinafter Channel 7 News) located at 190 North State Street in Chicago, "after receiving notice from the owner/occupant/agent" to depart (720 ILCS 5/21-3(a)(3) (West 2016)).

¶ 6    Prior to trial, the State, *inter alia*, filed a motion *in limine* asking that the defendant be precluded from arguing insanity at trial because the affirmative defense of insanity had not been pleaded. At the hearing on this motion, defense counsel indicated that he would not be raising an insanity defense. Instead, counsel asserted that he would be calling an expert witness to testify as to the defendant's ability to "knowingly" commit the crime. The State objected to the introduction of this evidence arguing that it was a "backdoor" method of arguing insanity, which had never been pleaded. The trial court disagreed, and overruled the State's objection, permitting the defense to offer the expert's testimony at trial. The trial court also invited the State to procure its own expert in rebuttal, if it wished to do so.

¶ 7    The parties proceeded to trial on April 25, 2017. During jury selection, the trial court instructed the venire as follows:

> "I'm going to collectively ask you four questions pursuant to Supreme Court Rule 431. I want you to answer as a group. The first question reads as follows.
>
> Do you understand and accept that a defendant is presumed innocent of the charges against him? Do you understand that and do you accept it?

---

[1] The record reveals that after initially being arrested on October 6, 2016, the defendant was released on bond. The defendant returned to Channel 7 News on October 7, 2016. He was again arrested, and charged separately with criminal trespass to property for that October 7, 2016, incident. The October 7, 2016, charge is not part of the instant appeal.

Second question. Do you understand and accept, before a defendant can be convicted, the State must prove that the defendant is guilty beyond a reasonable doubt? Do you understand that and do you accept it?

Do you understand and accept that the defendant is not required to offer any evidence on his own behalf? Do you understand that and do you accept it?

Do you understand and accept that the defendant has a right to testify or not to testify and that the defendant's choice not to testify cannot be held against him? Do you understand that and do you accept it?"

The transcript of the proceedings contains no response from the jury venire, either individually or collectively. Instead, immediately following these questions, the trial court stated: "Let the record reflect that they all understand and accept." The parties then proceeded with *voir dire*, after which a jury was selected and sworn.

¶ 8    Following opening statements, the following evidence was adduced. Michael Walsh testified that he works as a security guard for Channel 7 News, located at 190 N. State Street. Walsh testified that the building is private property. As part of his job, Walsh sits at the front desk in the lobby. The desk is about two feet from the rotating front door of the vestibule. Only employees with a key card, or individuals with an appointment can get past the front desk; everyone else would be asked to leave.

¶ 9    According to Walsh, in the evening of October 6, 2016, a man, whom he identified in court as the defendant, walked through the front door of the vestibule, identified himself as Percy Moore, and stated that he "wanted to go back to jail." Walsh had never met or seen the defendant before, so he asked the defendant to leave twice. The defendant remained inside the building and instructed Walsh to call the police.

4

¶ 10    Walsh telephoned the police and when they arrived, they also asked the defendant to leave several times. The defendant refused and was placed under arrest. Walsh testified that throughout the entire encounter, which lasted no more than 15 minutes, the defendant's demeanor was very calm and polite. On cross-examination, he acknowledged that the defendant was neither loud, nor violent, nor "made a scene." The defendant also did not attempt to go past Walsh or the front desk and did not resist arrest.

¶ 11    On cross-examination, Walsh also admitted that the rotating doors to the vestibule are not locked and that anybody can come through them. He acknowledged that anyone who believes they have a newsworthy story would use those same doors to enter the building. Walsh also acknowledged that the lobby has no signs prohibiting trespassers on the premises.

¶ 12    After the State rested its case in chief, the defense called two witnesses. First, the defendant testified on his own behalf. The defendant stated that he was 58 years old, that he is a high school graduate, and that he has two brothers and one sister. The defendant averred that he was unemployed but that he had previously worked at the Fire Station Museum in Richmond, Virginia, and at Coca Cola in Atlanta. He stated that he was "unjustly fired" from Coca Cola.

¶ 13    The defendant testified that on October 6, 2016, he went to Channel 7 News to tell them that he was "the first person they say who takes this cloning case to the Supreme Court and *** the first person who spent 20 years of his life locked up in the jail system." He further asserted that the police were causing his behavior by taking his legal documents and interfering with lawsuits he had filed against Coca Cola and other companies "concerning" what was in these documents. The defendant asserted that he had filed a lawsuit against Coca Cola and Judge Peggy Chiampas, because she took his "personal documents, mail."

¶ 14    The defendant further testified that he went to Channel 7 News to tell them that his mother

was "the true Henrietta Brown that the government took cells and eggs from." He averred that: (1) his mother was murdered by the "wicked medical part of the establishment;" (2) the book written about Henrietta Lacks[2] was written about "the phony Henrietta Lacks;" and (3) the children of the phony Henriette Lacks were going to receive billions of dollars that belonged to him and his siblings. The defendant testified at length, albeit incoherently, about the government's conspiracy to murder and exploit his family. Among other things, he asserted that the documents taken from him, exposed that: (1) his mother had been targeted because of a birthmark with special elements that align with portions of the Book of Revelations; (2) the government broke his mother's nose and reshaped it to look like a dog's nose so she would appear as part-dog; (3) the defendant had an "identical" "cloned" brother; (4) Eartha Kitt, who played Cat Woman on the original Batman TV show was his sister Evelyn's identical twin, but that her jaw had been broken by the government when she was taken from the defendant's mother so she would not be recognized; (5) "ladies" of the "secret society sorority" had punched the mouth of his younger brother Roy, who was one of the "little boys that wouldn't grow" to make him look like he had a dog's mouth; and (6) the government purposely covered up the brutal attack on "Girl X," the nine-year-old girl who was raped and left for dead in a Cabrini Green high rise because she was his niece and therefore his mother's descendant. The defendant also asserted that scientists cloned his mother and mixed his mother's cells with AIDS so that they could claim that AIDS came from her.

¶ 15     When asked what he wanted when he went to Channel 7 News, the defendant answered:

---

[2] The defendant was apparently referring to Henrietta Lacks, whose cancer cells are the source of the HeLa cell line, the first immortalized human cell line (which reproduces indefinitely under specific conditions), and one of the most important cell lines in medical research, because it can be used to study the effects of toxins, drugs, hormones and viruses without experimenting on humans. See https://www.hopkinsmedicine.org/hernirettalacks/index.html

"I told the man behind the desk, let Channel 7 News know that I'm back again and I'm ready to go in front of Judge Peggy Chiampas, who took my personal legal documents and said I don't have any entitlement to those documents." The defendant averred that he did not threaten or harm anybody, and that he did not scream or yell.

¶ 16     The defendant insisted that he did not have any mental problems because "the government is not gonna [*sic*] allow me to harass government buildings and the Channel 7 News building." As he stated: "If I had a mental problem, they would not even tolerate me." The defendant explained that he has been going to Channel 7 News and government buildings "for 20 years," two of these in Virginia and 18 in Chicago, "refusing to leave." He explained that "every time" he gets out, "that same day" he's "locked up, for 20 years."

¶ 17     On cross-examination, the defendant acknowledged that he came to Channel 7 News because he wanted to tell "his story" to the public. The defendant admitted that he did not have an appointment but stated that he did not need one because they knew he was coming since he had been coming there for years. The defendant explained that he had been at Channel 7 News about 30 times in the past for the same reason, to tell "his story." He admitted that he had never made appointments prior to coming to the building because "this [wa]s an emergency. You have an emergency when people are murdering your family. *** They're allowing them to put me behind bars."

¶ 18     On cross-examination, the defendant acknowledged that before he walked through the door of Channel 7 News on October 6, 2016, he had been told "not to be there." He admitted that he was aware that he was breaking the law by being there. Nonetheless, he explained that while under "man's law" he was not supposed to be there, under "God's law," "God demands justice."

7

The defendant also admitted that once inside the building, he was told to leave, but did not. He explained that instead, he insisted that the police come and take him in front of the judge.

¶ 19     The defendant also testified on cross-examination that it was his intent to return to Channel 7 News as soon as he was released from prison. As the defendant stated: "They know I'm coming right back when I leave here today. Whenever I leave jail, I'll be going right back."

¶ 20     The defense next called Dr. Robert Hanlon, an expert clinical neuropsychologist who specializes in forensic neuropsychology. At the outset, Dr. Hanlon's *curriculum vita* was published to the jury and he testified about his qualifications. Among these, Dr. Hanlon noted that for twenty years, he has been a professor of forensic neuropsychology and psychology at Northwestern University's Feinberg School of Medicine. He is also the codirector of that institution's Forensic Psychology Research Lab, the primary focus of which is the study of brain disorders that result in violent aggression. Dr. Hanlon estimated that in his career, he has conducted about 10,000 neuropsychological examinations.

¶ 21     Dr. Hanlon testified that on March 21, 2017, at defense counsel's request, he evaluated the defendant inside Cook county jail. The 4-hour evaluation included: (1) a 2- to 2 ½- hour interview, during which Dr. Hanlon asked the defendant questions about his background, ideas and beliefs; and (2) the administration of several tests, including the Intelligence Quotient (IQ) test and the Minnesota Multiphasic Personality Inventory test, which Dr. Hanlon described as the "most widely-used personality test" in forensic settings "in North America" and "an objective measure of different types of personality traits and features." In addition, the defendant provided Dr. Hanlon with voluminous documents (including his own written notes and random scraps of paper). For example, Dr. Hanlon testified that the defendant showed him a photograph of a

female, torn from a magazine advertisement for Newport cigarettes, and explained that this was a photograph of his mother's clone.

¶ 22   Based on his evaluation, Dr. Hanlon diagnosed the defendant with delusional disorder. Dr. Hanlon believed that the defendant had suffered from this disorder for about 17 years. According to Dr. Hanlon, delusional disorder is a type of psychotic disorder characterized by fixed false beliefs, which tend to be extremely rigid, irrational and illogical, and generally disconnected with reality. Individuals who manifest this disorder will continue to hold the delusional beliefs even when confronted with the irrationality of them.

¶ 23   Dr. Hanlon explained that the defendant suffers from two types of delusional beliefs: (1) persecutory delusions (rooted in paranoia and the belief that he has been mistreated, wronged and compromised by a government conspiracy); and (2) grandiose delusions (rooted in the belief that his mother was a relatively well-known person in the field of science, whose cancer cells were taken to develop a strain of cells for future research endeavors). According to Dr. Hanlon, the defendant genuinely believes these delusions to be true.

¶ 24   Dr. Hanlon also explained that because there is an obsessiveness to delusional beliefs, the defendant spends a considerable amount of time thinking about them. Nonetheless, according to Dr. Hanlon, outside of these delusional beliefs, the defendant can function relatively well in terms of his day-to-day activities, including self-care and the ability to communicate with others. As Dr. Hanlon explained: "As long as you don't drift into the content or topics of his delusional beliefs, you could probably have a relatively normal conversation with [the defendant.]"

¶ 25   Dr. Hanlon testified that there was no evidence that the defendant was feigning or malingering his delusional beliefs. As Dr. Hanlon explained, the defendant had no incentive to malinger, since his delusional beliefs had resulted in his intermittent incarceration over the years.

¶ 26    Dr. Hanlon also testified that while delusional disorders can be treated with antipsychotic medication, they are much more resistant to medications than more common psychotic disorders, such as schizophrenia.  Dr. Hanlon explained that as such delusional disorders are extremely difficult to treat.

¶ 27    Dr. Hanlon further averred that despite suffering from delusional disorder, the defendant does not pose a danger to others. According to Dr. Hanlon, while his delusions are severe, compared to other patients with the same disorder, the defendant is "comparatively nonviolent" and is not a significant threat to anyone.

¶ 28    Dr. Hanlon also testified that during his evaluation, he tested the defendant's IQ.  The defendant refused to be tested for his reading IQ, stating that reading has been an "area of difficulty" for most of his life.  As a result, Dr. Hanlon was only able to test for the defendant's verbal IQ score, which was 80, and corresponds with the ninth percentile of the population.  Dr. Hanlon clarified that neither the defendant's low IQ, nor his difficulty reading had caused his delusional disorder.

¶ 29    On cross-examination, Dr. Hanlon acknowledged that as part of his evaluation of the defendant, he did not perform any magnetic resonance imaging (MRI) or computerized tomography (CT) scans.

¶ 30    On cross-examination, Dr. Hanlon also admitted that the defendant understood "right from wrong," and was "completely capable of appreciating the criminality of his actions that resulted in his arrest."  In fact, the defendant explicitly told Dr. Hanlon that he knew that what he was doing was illegal and that he would be arrested.  Nonetheless, Dr. Hanlon explained that in the context of understanding the criminality of his actions, the defendant is incapable of discussing his case outside of his delusions, because those delusions form the foundation of his case.

¶ 31　　　　After the defense rested, the parties proceeded with arguments. In closing, the State asserted that it had unequivocally established that the defendant criminally trespassed at Channel 7 News. The State characterized all three trial witnesses as credible and pointed out that all three had testified that the defendant remained in the lobby of Channel 7 News after he had been explicitly instructed to leave.

¶ 32　　　　The State then argued that Dr. Hanlon's diagnosis was flawed because he did not perform a CT scan or an MRI. As the State pointed out:

> "Dr. Hanlon stood before you today and said that his certification is the study of the brain. How can you effectively study the brain without any type of imaging of it? Anyone could fake a personality question. Anyone could skew how they want to answer any type of question. The only way we could know definitively what the defendant's mental state was would be from some more proof that we didn't get today.
>
> What we also did not get today from Dr. Hanlon was any reports. So we're just listening to the word of the doctor. He said that he conducted a psychological exam. He asked questions about the defendant's personality, behavior, family and friends. How can we verify that? He did not prove to you or provide one report of the findings of his study."

¶ 33　　　　The State then suggested that because Dr. Hanlon's evaluation of the defendant had occurred a month before trial, Dr. Hanlon's testimony was unreliable because it was unsupported by any written report. As the State argued:

> "Without any proof, any paperwork, anything that would indicate what he learned from the defendant, he could have easily mixed up the facts of this case with any other case. The question is we don't have that proof, that report, that psychological exam to actually know what was wrong with the defendant or what wasn't."

¶ 34    After the State's closing, defense counsel argued that the defendant needed, "Help, not handcuffs." Defense counsel reiterated that the State had the burden of proving each element of the charged criminal trespass to property count, and argued that in light of the defendant's delusions, the State had failed to prove that the defendant had the requisite knowledge beyond a reasonable doubt. Defense counsel also emphasized that the defendant never moved past the security desk in the lobby.

¶ 35    In rebuttal, the State argued that instead of coming to Channel 7 News, the defendant should have used the internet to "tell his story." At this point in the proceedings, the defendant interjected:

> "And I did that. I came to their office like they told me to do. Then they reneged and put me on the Internet. I'm glad he brought that up. They didn't keep their word like—"

The court instructed the defendant not to interject. The State then concluded its rebuttal argument by noting that there were appropriate and inappropriate ways to send a message, and that it was an "unfair waste of [the jury's] time, the court's time and the police's time" to "have to keep, routinely, returning to this matter."

¶ 36    After deliberations, the jury returned a verdict of guilty. The defendant proceeded to sentencing. In aggravation, the State argued that the defendant had 11 prior misdemeanor convictions, most recently a 2016 criminal trespass to land, and asked for the maximum sentence of 180 days' imprisonment. In mitigation, defense counsel referred to Dr. Hanlon's trial testimony and asked that the defendant be given "time served." The trial court sentenced the defendant to 180 days' imprisonment in the CCDOC but found that he had already served double that time while awaiting trial. The defendant now appeals.

¶ 37                                II.  ANALYSIS

¶ 38                                    A.  Sufficiency of Evidence

¶ 39       On appeal, the defendant first contends that the State failed to prove beyond a reasonable doubt the requisite *mens rea* of the charged offense of criminal trespass to property. Specifically, the defendant asserts that because the evidence at trial unequivocally established that he suffered from delusional disorder when he went to Channel 7 News, the State failed to prove that he *knowingly* refused to leave Channel 7 News after being instructed by Walsh to do so.  For the reasons that follow, we disagree.

¶ 40       It is well-settled that when reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether the evidence, when viewed in the light most favorable to the State, would have permitted any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48; see also *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)).  It is the responsibility of the trier of fact to resolve conflicting testimony, to weigh the evidence, and to draw reasonable inferences from those facts.  See *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Tigner*, 194 Ill. App. 3d 600, 606 (1990) ("Having had the opportunity to view the witnesses, the trial court is in a much better position to make the credibility assessment.").  Where the evidence produces "conflicting inferences" it is the trier of fact's responsibility to resolve that conflict.  *People v. Pryor*, 372 Ill. App .3d 422, 430 (2007).  Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues of weight of evidence, or the credibility of witnesses.  See *Brown*, 2013 IL 114196, ¶ 48.  A criminal conviction will be reversed only where the evidence is so contrary to the verdict, or so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt regarding the defendant's guilt.  *Brown*, 2013 IL 114196, ¶ 48.

¶ 41    As a general rule, to sustain a criminal conviction, the State must prove that the defendant performed a prohibited act (*actus reus*) with the prescribed mental state (*mens rea*). *People v. Nelson*, 2013 IL App (3d) 120191, ¶ 25; *People v. Stiles*, 334 Ill. App. 3d 953, 956 (2003).

¶ 42    In the present case, the defendant was charged with misdemeanor criminal trespass to property under section 21-3(a)(3) of the Criminal Code of 2012 (720 ILCS 5/21-3(a)(3) (West 2016)). To obtain a conviction under this section, the State had to establish beyond a reasonable doubt that the defendant "remain[ed] upon the land of another, after receiving notice from the owner or occupant to depart." *Id.* "Although the language of the [criminal trespass] statute does not expressly set forth a mental-state requirement, case law has established that the 'knowingly' mental state applies to all elements of the offense." *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 34.

¶ 43    A person acts knowingly with regard to: (1) "the nature or attendant circumstances of his conduct" when "he is consciously aware that his conduct is of such a nature or that such circumstances exist," or (2) "the result of his conduct," when "he is consciously aware that such result is practically certain to be caused" by it. 720 ILCS 5/4–5 (West 2016); see also *People v. Schmidt*, 392 Ill. App. 3d 689, 702 (2009); IPI Criminal 4th No. 5.01B. "Knowledge of a material fact includes awareness of the substantial probability that such fact exists." *Id.* Because one's mental state is rarely susceptible to direct proof, whether a person acted with intent, such as knowingness, is generally established through circumstantial evidence and inferred from the defendant's conduct and the circumstances surrounding his actions. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 44; *People v. Price*, 225 Ill. App. 3d 1032 (1992).

Our courts have long held that any " 'inferences as to [a] defendant's mental state are a matter particularly within the province of the jury.' " *Schmidt*, 392 Ill. App. 3d at 702 (quoting *People v. DiVincenzo*, 183 Ill. 2d 239, 252-53 (1998)).

¶ 44    In the present case, viewing, as we must, the trial testimony in the light most favorable to the State, we find that the evidence overwhelmingly established that the defendant had the requisite knowledge to commit criminal trespass to property. The evidence at trial was uncontroverted that Channel 7 News is private property, not open to the public. The evidence was further uncontroverted that the defendant, who admitted he knew he was not supposed to go there, entered the lobby of Channel 7 News and that after twice being instructed by security guard Walsh to leave, continued to remain inside the building, instead asking Walsh to call the police so that he could "be arrested" and "go before a judge." The evidence further unequivocally established that even after the police arrived and repeatedly asked the defendant to leave, the defendant refused, until he was placed under arrest. Both Walsh and the defendant testified to these facts, and no contradictory evidence was presented by either party at trial.

¶ 45    What is more, the testimony of both defense witnesses unmistakably established that the defendant had the requisite mental state to commit criminal trespass to property. The defendant himself admitted that he knew he was breaking the law on October 6, 2016, when he entered Channel 7 News and remained there after being told by Walsh to leave. The defendant specifically acknowledged that under "man's law" he was not supposed to be inside Channel 7 News. The defendant's awareness of his actions is further supported by his testimony regarding his prior conduct. The defendant testified that prior to this incident, he had entered Channel 7 News, at least 30 times. He acknowledged that on each of these occasions, he had been told to leave, but refused, after which he was "locked up." Moreover, the defendant's own expert, Dr.

15

Hanlon, acknowledged that even though the defendant suffered from delusional disorder, he understood "right from wrong," and was "completely capable of appreciating the criminality of his actions that resulted in his arrest." In fact, Dr. Hanlon acknowledged that the defendant explicitly told him during their interview that he knew that what he was doing was illegal and that he would be arrested.

¶ 46     Under this record, and viewing, as we must, the evidence in the light most favorable to the State we find that there was more than sufficient evidence from which the jury could infer that the defendant had the requisite mental state to commit the offense of criminal trespass to property. See 720 ILCS 5/4–5 (West 2016); see *Schmidt*, 392 Ill. App. 3d at 702.

¶ 47     In coming to this conclusion, we have considered the decisions in *People v Jackson*, 2017 IL App (1st) 142879 and *People v. Lee*, 2017 IL App (1st) 151652, cited to by the defendant and find them inapposite.

¶ 48     The defendant cites to these decisions for the proposition that a defendant's erratic or irrational behavior may undermine the inference that he knowingly partook in prohibited conduct, *i.e.*, that he was consciously aware of his actions or the results of such conduct. Contrary to the defendant's position, however, neither *Lee* nor *Jackson* involve the *mens rea* element of criminal trespass to property. Rather, both decisions concern battery charges resulting from allegedly impulsive and violent acts committed by mentally ill defendants in response to attempts at medical treatment.

¶ 49     In *Jackson*, the defendant successfully appealed among other things, his conviction for battery of a police officer. *Jackson*, 2017 IL App (1st) 142879, ¶¶ 22-31. In that case, the defendant had called 911 from his apartment building requesting an ambulance. *Id.*, ¶ 10. When the paramedics arrived, they found the defendant acting "nervous" and "irrational" as though he

16

were "suffering from some type of psychological issue." *Id.*, ¶ 11. According to the paramedics, the defendant could not follow simple directions and did not seem to be thinking clearly. *Id*. In addition, he smelled of marijuana. *Id*. The defendant refused to go with the paramedics yelling at them not to touch him because they were "not the ambulance." *Id.*, ¶ 10. The paramedics asked for assistance from the police. *Id*. When the police arrived, and attempted to calm the defendant, the defendant tried to "defend" himself by punching and kicking at the officers and biting the paramedics. *Id.*, ¶ 13. One of the officers then used his taser on the defendant approximately 10 times. *Id.* During this struggle, the defendant kicked one of the police officers in the shins. *Id.*, ¶ 14. The defendant was subsequently charged, tried and convicted of, *inter alia*, battery of a police officer. *Id.*, ¶ 2.

¶ 50       On appeal, this court reversed the defendant's conviction, finding that the State had presented "little-to-no evidence that [the defendant] behaved 'knowingly.' " *Id.*, ¶ 27. In coming to this conclusion, the court found relevant that: (1) both paramedics noted that upon their arrival the defendant was "nervous" and "agitated;" (2) one paramedic testified that he believed the defendant was suffering from some type of psychological episode; (3) the second paramedic believed that the defendant's "mental state was altered;" (4) the police officer whom the defendant kicked testified that he immediately recognized the defendant's behavior as "irrational;" (5) none of the paramedics or officers could communicate with the defendant; and (5) even though the paramedics were in uniform and driving a vehicle distinctively marked as an ambulance, the defendant repeatedly denied that they were in fact paramedics. *Id.*, ¶ 26. Based on this evidence the court found that the defendant, who had appeared to be "defending" himself could not have been "consciously aware" that his thrashing would result in kicking the officer, or

even that the person he was kicking was in fact a police officer, as required under the statute. *Id.*, ¶ 27.

¶ 51    The *Jackson* court reasoned that when a defendant behaves "normally" it is easy to make an inference that he or she "knows," *i.e.* is "consciously aware" of the consequences of his or her actions. *Id.*, ¶ 29. However, the court held under the particular circumstances of that case, where all of the State's witnesses had testified that the defendant was not behaving "normally," it was impossible to infer from the defendant's actions that he was "consciously aware" of what he was doing and the result of his actions. *Id.*, ¶ 29.

¶ 52    Unlike *Jackson*, in the present case none of the witnesses testified that the defendant was acting abnormally, or that he appeared "erratic" or "irrational," so as to permit the inference that he was not "consciously aware" of what he was doing or the results of his conduct. Instead, both Walsh and the defendant averred that throughout the encounter, the defendant seemed calm, and polite, never attempting to create a scene. In addition, both witnesses averred that the defendant asked Walsh to call the police, knowing fully well that this would result in him being "arrested" and ultimately "brought before a judge." The defendant's own expert, Dr. Hanlon, opined that despite his delusional disorder, the defendant knew right from wrong and was "completely capable of understanding the criminality of his own conduct, which resulted in his arrest." Dr. Hanlon testified that the defendant had explicitly told him that he knew that what he was doing was illegal and that it would result in his arrest. Moreover, unlike the isolated incident in *Jackson*, here, where the defendant admitted to having visited Channel 7 News at least 30 times in the past, resulting in numerous prior "lockups" there was more than sufficient evidence form which the jury could infer that the defendant was "consciously aware" of what he was doing (*i.e.*, refusing to leave the building despite requests from Walsh to do so) and that this behavior would

result in his arrest. Accordingly, we find *Jackson* clearly distinguishable from the facts of this case.

¶ 53    *Lee* is similarly inapposite. In that case, the defendant, a diagnosed schizophrenic, was taken to Illinois Masonic hospital after having attempted suicide by overdosing on prescription medication when learning that his son had died in a car accident earlier that day. *Lee*, 2017 IL App (1st) 151652, ¶ 22. The defendant was charged with battery of a nurse after he allegedly struck the nurse in an attempt to prevent her from removing a golden cross, which had been given to him by his partner, from his neck. *Id*., ¶ 22. In reversing the defendant's conviction, the appellate court found that the evidence did not support an inference that the defendant intended to strike the nurse. *Id*. The court found relevant that both the victim, and another attending nurse acknowledged that the altercation was provoked by the victim attempting to remove the defendant's cross, and that all they saw was the defendant's arm move briefly toward the victim during the struggle. *Id*. The court also found relevant that the defendant could not recall certain parts of his encounter with the nurse as a result of having recently ingested large doses of prescription medication in his attempt to commit suicide. *Id*. Under these facts, the court found that the evidence only showed that the defendant "inadvertently struck" the victim, but that he was not "consciously aware" of either his conduct or the results of his actions. *Id*., ¶ 21.

¶ 54    The facts of *Lee* are by no means analogous to the facts of this case. Unlike *Lee*, in the instant matter, there is not an iota of evidence to suggest that the defendant's conduct was inadvertent. As noted above, the defendant himself admitted that he consciously entered Channel 7 News in an attempt to be "brought before a judge," so that he could tell the public "his story." The defendant further admitted that prior to this date he had been told on numerous occasions not to come to Channel 7 News. He acknowledged that on the many prior occasions

that he entered the building, and refused to leave, he had been arrested and "locked up." He even told Dr. Hanlon that he knew that what he was doing was illegal and that it would result in his arrest. Under these circumstances, the jury was presented with overwhelming evidence that the defendant acted knowingly.

¶ 55    For these reasons, we find *Lee* and *Jackson* inapposite and conclude that the jury properly found the defendant guilty beyond a reasonable doubt of criminal trespass to property.

¶ 56    In reaching this decision, however, we do not mean to minimize the plight of the mentally ill or the shortcomings of our criminal justice system in working with individuals with psychiatric and/or mental health issues. We fully recognize that "due to a number of factors, including deinstitutionalization and the inadequacy of community-based psychiatric services, people with mental illness are arrested for minor offenses that would formerly have been seen as requiring medical attention but are now seen as behaviors that require punishment through the criminal system." *People v. Lee*, 2017 IL App (1st) 151652, ¶ 31 (Hyman, J., specially concurring). We further acknowledge that as a result of these factors our " 'nation's jails and prisons have become, *de facto*, the nation's largest psychiatric hospitals.' " *Id*. (quoting Jennifer. L. Skeem, Sarah Manchak, & Jillian K. Peterson, Correctional Policy for Offenders with mental Illness: Creating a New Paradigm for Recidivism Reduction, 35 Law & Hum. Behav. 110, 111 (2011)). Nonetheless, regardless of these prevalent concerns, in the present case, under the applicable standard of review and the specific facts before us, we are compelled to affirm the judgment of the circuit court.

¶ 57                            B. Prosecutorial Misconduct

¶ 58    The defendant next contends that in closing argument, the State improperly shifted the

burden of proof to the defense by encouraging jurors to ignore unrebutted expert testimony on the basis of assertions unsupported by the evidence. The defendant concedes that he forfeited this issue by failing to properly object to it below and to specifically raise it in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *People v. Wood*, 214 Ill. 2d 455, 470 (2005) (A "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve an alleged error for review.") The defendant nonetheless asks that we review his argument under the plain error doctrine.

¶ 59        The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (citing *People v. Averett*, 237 Ill. 2d 1, 18 (2010)); see also *People v. Fort*, 2017 IL 118966, ¶ 18 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87) (2005)). Specifically, the plain error doctrine permits "a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87); see also *People v. Adams*, 2012 IL 111168, ¶ 21; see also *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58. Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *Anaya*, 2017 IL App (1st) 150074, ¶ 58; see also *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 29 (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)).

¶ 60        "The first step of plain-error review is to determine whether any error occurred." *Lewis*, 234

Ill. 2d at 43; *Thompson*, 238 Ill. 2d at 613; see also *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010) ("There can be no plain error if there was no error at all."). This requires "a substantive look" at the issue raised. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). We will therefore first review the defendant's claims to determine whether was any error.

¶ 61    It is axiomatic that a prosecutor is allowed wide latitude during closing argument (*Anaya*, 2017 IL App (1st) 150074, ¶ 62), and that even improper remarks will not merit reversal unless they result in substantial prejudice to the defendant (*People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57). Our courts have long held that it is "impermissible for the prosecution to attempt to shift the burden of proof to the defense." *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). Indeed, the defense has no obligation to present any evidence whatsoever, and the prosecution has the burden of proving beyond a reasonable doubt all of the essential and material facts constituting the crime. *Id*. Nonetheless, our courts have never implied that once a defendant does present certain evidence "it is beyond the reach of appropriate comment by the prosecutor." *Id*. Accordingly, during closing argument, the prosecutor may properly: (1) comment on facts presented in evidence or upon reasonable inferences drawn from that evidence; (2) respond to comments made by defense counsel which clearly invite response; and (3) comment on the credibility of witnesses. *Cosmano*, 2011 IL App (1st) 101196, ¶ 57; *Anaya*, 2017 IL App (1st) 150074, ¶ 62. In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context. *Id*.

¶ 62    Although at present, our courts disagree as to whether we review this issue *de novo* or for abuse of discretion (*People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 76-78; see also *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009) (comparing *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that

they warrant a new trial is a legal issue this court reviews *de novo*.”), with *People v. Blue*, 189 Ill. 2d 99, 132 (2000) (“[W]e conclude that the trial court abused its discretion” by allowing various prosecutorial remarks during closing argument))), we find that the outcome here is the same regardless of the applicable standard of review.

¶ 63     On appeal, the defendant contends that the State improperly shifted the burden of proof regarding *mens rea* by repeatedly suggesting that the defense needed more proof of the defendant’s mental state to establish his innocence.  Specifically, the defendant asserts that in closing, the State improperly challenged Dr. Hanlon’s credibility by arguing that his diagnosis was unreliable because he did not perform a CT scan or an MRI, and because he failed to provide any written reports or paperwork of his findings.  According to the defendant, by imputing that the defense was required to provide any such evidence to the jury, the State improperly shifted the burden of proof to the defendant to establish the requisite element of knowledge.  We disagree.

¶ 64     When read in context of the entire closing argument, it is apparent that the State’s comments were aimed at attacking Dr. Hanlon’s credibility, by challenging his memory of the defendant’s evaluation, and the methods he used in making his diagnosis, rather than aimed at shifting the burden of proof to the defendant.  Accordingly, the comments were proper.  *People v. Glasper*, 234 Ill. 2d 173, 207 (2009) (“It is not error for the State to challenge a defendant's credibility or the credibility of his theory of defense when evidence exists to support the challenge.” *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000) (“The State may challenge a defendant's credibility and the credibility of his theory of defense in closing argument when there is evidence to support such a challenge.”)

¶ 65     Moreover, regardless of any error, as explained below, the comments did not rise to the level

of plain error meriting review.

¶ 66    With respect to the first prong of plain error analysis, we have already concluded that the evidence at the defendant's trial was by no means closely balanced but rather overwhelmingly established that the defendant had the requisite *mens rea* to commit the crime. As already explained above, the evidence overwhelmingly established that the defendant entered and remained inside Channel 7 News after having been instructed to leave, knowing fully well that what he was doing was illegal and that remaining inside the building would result in his arrest. Moreover, the record below establishes that the jury was instructed both at the beginning and end of trial that the State bore the burden of proving each element of the charged offense beyond a reasonable doubt and that the defendant had no obligation to prove his innocence. The jury was further instructed that neither opening nor closing arguments constitute evidence and that any statements or argument made by the attorneys, which are not based on the evidence should be disregarded. Thus, where the court provided sufficient instructions as to the State's burden of proof, and the evidence overwhelmingly established the defendant possessed the requisite *mens rea*, the State's comments, even if improper, could not have affected the outcome of the defendant's trial. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it.").

¶ 67    The defendant nonetheless contends that he is entitled to review under the second prong of plain error analysis, because the prosecutor's improper comments were so egregious that they denied him a fair trial. In support, the defendant relies on *People v. Yonker*, 256 Ill. App. 3d 795, 799 (1993), where, in finding reversible error, this court stated that to " 'misstate the burden of proof or standard of review, to any extent, compromises the fairness of the judicial process and shall not be tolerated.' *People v. Wilson*, 199 Ill. App. 3d 792, 797 (1990),"

24

¶ 68　　Contrary to the defendant's position, however, we have since reconsidered our comments in *Yonker*, and held that they "understate[d] the defendant's burden to establish plain error." *People v. Euell*, 2012 IL App (2d) 101130, ¶ 21.　In *Euell*, we noted that it is axiomatic that under the second prong of plain error, a prosecutor's improper comment constitutes plain error only "when it is either so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten the deterioration of the judicial process." *Id*.　We explained that this "standard is plainly inconsistent with the view [adopted by *Yonker*] that *any* misstatement of the burden of proof, to *any* extent, is plain error." *Id*.　Moreover, we noted that even in the context of a preserved issue, improper comments are considered harmless unless they result in "substantial prejudice to the defendants' right to fair trial." *Id*. ¶ 22.　Accordingly, we held that since "we do not automatically reverse in light of a *preserved* misstatement of the burden of proof, certainly we may not automatically reverse in light of a *forfeited* one." *Id*.　We therefore concluded that in accordance with the plain error rule, the proper approach is to review under second prong plain error only if the State's comments were so inflammatory or so flagrant that the defendant was denied a fair trial. *Id*.　In performing this analysis, we consider the language used by the prosecutor in relation to the evidence, and the effect of the argument on the defendant's right to a fair trial. *Id*.

¶ 69　　In the present case, under the *Euell* rationale, we conclude that the prosecutor's comments were neither so inflammatory nor so flagrant that they denied the defendant a fair trial. *Id*.　The State's comments were relatively brief and isolated in the State's overall argument.　While the comments were not invited, they were made in response to a particular point of argument rather than as a general attack upon the burden of proof or the defendant's presumption of innocence.　Specifically, the State's comments were geared to attacking the credibility of the defendant's

expert witness and his testimony regarding the impact the defendant's disorder had on his ability to appreciate and understand the consequences of his conduct. To be sure, implying that the defendant had the burden to establish that he did not have the requisite *mens rea* would have been error. However, the State at no time directly stated that the defendant had such a burden. Rather, the prosecutor repeatedly noted that it was the State's burden to prove all the elements of the offense, including the *knowing* element. The upshot of the State's argument about Dr. Hanlon's failure to provide scans and written reports was to question his evaluation methods, and his memory, in an attempt to discredit his diagnosis. Therefore, the prosecutor's comments did not deprive the defendant of a fair trial.

¶ 70                                 C. Jury Venire Instruction

¶ 71     The defendant next contends that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by not making certain each venire person understood and accepted the principles outlined in *People v. Zehr*, 103 Ill. 2d 472 (1984). The defendant again acknowledges that he forfeited this issue for purposes of appeal but nonetheless asks this court to review it under the first prong of plain error analysis. For the reason that follow, we find that the defendant has failed in his burden of establishing plain error.

¶ 72     Pursuant to Illinois Supreme Court Rule 431(b), the trial court must question prospective jurors, individually or in a group, if they understand and accept that: (1) a defendant is presumed innocent; (2) the defendant must be proved guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence on his own behalf; and (4) if a defendant does not testify on his own behalf it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *Zehr*, 103 Ill. 2d at 477. The Rule requires that "the court's method of inquiry" provide "each juror an

opportunity to respond to specific questions" concerning these principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Compliance with the Rule is reviewed *de novo*. Id.

¶ 73     In *Wilmington*, our supreme court found error where the trial court asked if anyone in the pool of potential jurors "disagreed" with three of the *Zehr* principles. *Wilmington*, 2013 IL 112938, ¶ 28. The court concluded that although it was "arguable that the [trial] court's asking for disagreement, and getting none, is equivalent to juror acceptance of the principles, the trial court's failure to ask jurors if they understood the four Rule 431(b) principles is error in and of itself." *Id*. ¶ 32.

¶ 74     The defendant here argues that the trial court failed to comply with the Rule because it instructed the entire venire to respond as a group. The defendant additionally points out that the judge did not follow his questions with an instruction to raise a hand if anyone did not understand or agree with a principle, and that the record reflects only one non-verbal response to all of the questions, namely the judge's statement: "Let the record reflect that they all understand and accept." The defendant asserts that this manner of questioning failed to ensure that each juror had an opportunity to respond to the questions. We disagree.

¶ 75     Contrary to the defendant's position, we have previously held that a trial court does not violate Rule 431(b) by asking the jurors if they understood the four principles in compound form. *People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97 (2010). We noted that the Rule does not require separate questions of the jurors about each individual principle. *Id*. "Nor does the rule require separate, individual answers from each juror." *Id*. at 1197.

¶ 76     Moreover, even if we were to conclude that the trial court failed to comply with Rule 431(b), for the reasons already articulated above, we find that the defendant has failed to establish that any such error rose to the level of plain error under the first prong. In light of the overwhelming

27

evidence of the defendant's guilt, any error arising from the trial court's failure to comply with the Rule 431(b) could not have impacted the outcome of the defendant's trial.

¶ 77                                   III.  CONCLUSION

¶ 78      For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 79      Affirmed.

¶ 80      JUSTICE PUCINSKI, specially concurs:

¶ 81      While I agree with the majority on its decision to affirm the judgment of the circuit court, I write specially about the questioning of the venire in this matter.

¶ 82      Illinois Supreme Court Rule 431(c) requires trial judges to ask potential jurors eight questions:

1)  do you understand that a defendant is presumed innocent of the charges against him?

2)  do you accept that principle of law?

3)  do you understand that before a defendant can be convicted the State must prove that the defendant is guilty beyond a reasonable doubt?

4)  do you accept that principle of law?

5)  do you understand that the defendant is not required to offer any evidence on his own behalf?

6)  do you accept that principle of law?

7)  do you understand that the defendant has a right to testify or not to testify and that the defendant's choice not to testify cannot be held against him?

8)  do you accept that principle of law?

¶ 83      These questions are designed to test the prospective jurors' fundamental understanding and

acceptance of the foundational principles of our democracy and jurisprudence. While precedent has permitted the bundling of the four principles into four questions, one question instead of two on each principle, it is not asking too much of criminal trial judges to take steps to underscore the importance of each of the eight questions. Taking the shortcut of asking the questions without time to get responses from the jurors may deprive even one juror of the opportunity to raise a hand and ask for an explanation or, in fact, acknowledge that he or she disagrees with the principle in question, either one of which may significantly impact the defendant. When a person's liberty interest is at stake, shortcuts should be unacceptable.