# Illinois Official Reports

## Appellate Court

***People v. Lee*, 2017 IL App (1st) 151652**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIMMY LEE, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-1652 |
| Filed | October 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-13802; the Hon. Clayton Jay Crane, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Tonya Joy Reedy, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Michelle Corda, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Presiding Justice Neville concurred in the judgment and opinion.<br>Justice Hyman specially concurred, with opinion. |

**OPINION**

¶ 1     Following a bench trial in Cook County, defendant Jimmy Lee was convicted of aggravated battery of a nurse (720 ILCS 5/12-3.05(d)(11) (West 2014)) and sentenced to 27 months' imprisonment. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. We reverse.

¶ 2     Defendant was arrested on July 24, 2014, as a result of a July 4, 2014, physical altercation with Emily Reich, a nurse who was treating defendant for an intentional drug overdose at Advocate Illinois Masonic Medical Center (Illinois Masonic). He was subsequently charged with two counts of aggravated battery. Count I alleged that defendant knowingly caused bodily harm to Reich, whom he knew to be a nurse performing her official duties. Count II alleged that defendant used a deadly weapon to cause bodily harm to Reich. Count II was amended before trial to allege that defendant knowingly made physical contact of an insulting or provoking nature with Reich, whom he knew to be a nurse performing her official duties. Defendant waived his right to a jury trial, and the case proceeded to a bench trial.

¶ 3     At trial, Reich testified that, at 11:30 p.m. on July 4, 2014, she was working as an emergency room (ER) nurse at Illinois Masonic when defendant was admitted to the hospital. Defendant was accompanied by paramedics and police officers. He was yelling abusively. Emergency personnel informed Reich that defendant had suicidal thoughts and had intentionally overdosed on prescription medication. Reich was familiar with defendant and had treated him at the hospital on approximately five previous occasions. When Reich entered defendant's hospital room, she was wearing her scrubs with embroidering that indicated she was a nurse.

¶ 4     As Reich entered defendant's room, she noticed that he had changed into a hospital gown but was still wearing a chain necklace with a four-by-three-inch metal cross at the bottom of it. Reich testified that hospital protocol dictates that, once it is known that a patient has had suicidal thoughts, all personal items are removed because they could be used as potential weapons against the patient or the staff. Reich told defendant that "[w]e're going to need to remove" the necklace. Defendant refused and called her vulgar names. He also threatened to kill her. Defendant told Reich the necklace was a gift and that she could not have it. Reich explained to defendant that the necklace needed to be removed for safety purposes and reached toward defendant to remove it. Another nurse in the room, standing on the opposite side of defendant, attempted to calm him down while Reich removed the necklace. As Reich was leaning over defendant trying to unclasp the necklace, he pulled away, cross clutched in his hand, and the chain broke. At this time, Reich noticed defendant's "elbow come down and his hand go back up," which made her "flinch." She then felt something very sharp on her forehead and realized that defendant had hit her with the cross he was holding.

¶ 5     After doing so, defendant threw the cross onto the floor. Reich walked over to where defendant had thrown the cross and bent down to retrieve it. As Reich rose, she found defendant standing over her and threatening to kill her. Reich exited the room when additional staff entered the room. After Reich left the room, she noticed a red mark about three-quarters of an inch long right along her hairline. Reich stated that she felt a stinging pain throughout the night.

¶ 6        The State introduced into evidence a surveillance video depicting Reich's interaction with defendant. The video was played in open court. Reich testified that the video shows her entering defendant's room and telling him that his necklace needed to be removed. The video also shows a brief struggle between Reich and defendant. According to Reich, the video depicts her leaning over defendant to unclasp the necklace, defendant's hand reaching up to prevent her from removing the necklace, and defendant's hand briefly "flutter[ing]," which was when Reich said defendant hit her with the cross. Defendant is also depicted leaving his bed to stand over Reich as she is bent down in the corner of the hospital room picking up the necklace. Reich described the video as a true and accurate depiction of what occurred on the night in question.

¶ 7        On cross-examination, Reich testified that emergency personnel did not inform her that defendant was grieving the loss of a loved one. Reich admitted that she was familiar with defendant's mental health history and that she had a similar encounter with defendant during one of his previous visits to the hospital. Reich stated that she previously had a patient commit suicide using a similar item as the cross. About 20 minutes after defendant hit her, Reich noticed a mark near her hairline, which was visible until the next day. At 1:45 a.m. on July 5, 2014, Reich met with Officer Okazaki to report her injury and give a statement about what had occurred.

¶ 8        Katie Blazek testified that, on July 4, 2014, she was working at Illinois Masonic as an ER nurse. Blazek was familiar with defendant from his previous visits to the ER at Illinois Masonic. On the night in question, Blazek was wearing her scrubs and a badge that indicated she was a nurse. Before defendant entered the ER, she could hear him yelling. Initially, defendant's yelling was not directed to anyone in particular. Blazek provided medical services to defendant, including taking his vital signs, drawing his blood, and starting an IV. Defendant was cooperative during those treatments.

¶ 9        Blazek testified that, per hospital protocol, all belongings are removed from patients and that defendant had a necklace with a cross on it that needed to be removed. When Reich entered the room and informed defendant that his necklace would need to be removed, defendant's yelling became directed at Reich. Defendant told the nurses "point blank" that they were not going to get the necklace off of him. Blazek and Reich were both standing at defendant's bedside but on opposite sides of the bed near his head. As Reich attempted to remove defendant's necklace, Blazek saw defendant's hand move "in a very fast motion across the bed towards the opposite side of the bed." Blazek did not see defendant's hand or fist strike Reich because she was focused on defendant at that time. Defendant then threw the cross to the other side of the room. Blazek turned her back to attend to her duties. When she turned around again, defendant was out of bed and standing over Reich, who was bending down in the corner of the room. Blazek wanted defendant to return to his bed but feared that he would hit her if she stepped in front of him. Because defendant was connected by cables to the monitor next to his bed, Blazek pulled the cables to get him back into the bed. The State then rested.

¶ 10       Defendant testified that, on July 4, 2014, he had learned that both his partner and his son were in a car accident and that his son had not survived the accident. Defendant attempted to commit suicide by overdosing on prescription medication. Defendant was then transported by ambulance to Illinois Masonic, where he has been a patient since 2006. Defendant is a diagnosed schizophrenic. He stated that he respects the staff at Illinois Masonic and credits

them with saving his life "so many times." During his testimony, defendant referred to several of the hospital's nursing staff and doctors by their first names.

¶ 11 At the hospital, defendant was treated by Blazek and then Reich. When Reich entered the room, she said, "Jimmy, I need to take your cross off." Defendant described Reich as being "really loud and boisterous about it." He refused to remove the cross and explained that it had been a gift from his partner. At this time, Blazek, with whom defendant stated he has a "close relationship," was attempting to reassure and comfort him. Defendant was calm and cooperative when Blazek was treating him because he "had no fear." He stated that Reich reached for his cross and said "[i]t's mine now." As Reich reached around his neck, defendant grabbed her hand. Reich then pulled on the necklace, which broke the clasp of the chain holding the cross, causing it to fall and slide across the floor. Defendant stated that the next thing he remembers is Reich leaving the room and later coming back with the cross in a bag, returning it to him. Defendant denied ever striking Reich. He could not recall leaving his bed and approaching Reich.

¶ 12 On cross-examination, defendant acknowledged that he knew both Reich and Blazek "very well." Defendant stated that he was "in a volatile mood" because Reich was arguing with him and that he was "upset because of the way [Reich] presented herself." Defendant explained, "She reached for the cross, and she was volatile in her actions, and I was volatile right back." Defendant denied that Reich explained to him why she needed to remove the cross.

¶ 13 The parties stipulated that, if called, Officer Devin Okazaki would testify that he met with Reich on July 4, 2014, and that Reich related to him that defendant deliberately struck her and then chest bumped her before being restrained by hospital security. Officer Okazaki observed no injury to Reich.

¶ 14 Based on this evidence, the trial court found defendant guilty of aggravated battery of a nurse. In announcing its decision, the court noted that it was "clear" that defendant was familiar with the procedures at Illinois Masonic and the nursing staff, whom he knew on a first-name basis. Therefore, the court did not question that defendant knew Reich was a nurse performing her official duties at the time of the incident. The court then noted that there was some disagreement in the testimony regarding what happened during the struggle for the cross, but that it had "no difficulty" with Reich's testimony. The court found that defendant intentionally struck Reich during the struggle and had no valid defense for doing so. The case proceeded to posttrial motions and sentencing.

¶ 15 The court denied defendant's motions for a new trial and sentenced him to 27 months' imprisonment. Defendant timely appealed.

¶ 16 On appeal, defendant contends that his conviction should be reversed because the State did not prove all the elements of the offense beyond a reasonable doubt. He also argues that he was exercising his right to withhold his consent to medical treatment that would require him to remove his cross and, as a result, was justified in using force against Reich.

¶ 17 When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). All reasonable inferences from the record must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of

- 4 -

the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 18 To establish that defendant committed aggravated battery, in this case, the State had to prove that defendant committed a battery on a person that he knew to be a nurse in the performance of her duties. See 720 ILCS 5/12-3.05(d)(11) (West 2014). To establish that defendant committed battery against Reich, the State had to prove that defendant knowingly, without legal justification, by any means (1) caused bodily harm to her or (2) made physical contact of an insulting or provoking nature with her. 720 ILCS 5/12-3(a) (West 2014). A person acts "knowingly" when he or she is "consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2014).

¶ 19 In this case, defendant does not challenge that the cross on his necklace made contact with Reich or caused her bodily harm. Rather, he contends that the State failed to prove all of the elements of the offense of aggravated battery beyond a reasonable doubt. Intent is an essential element of the offense of battery. *People v. Robinson*, 379 Ill. App. 3d 679, 684-85 (2008). Thus, the State had the burden of proving that defendant's conduct was knowing or intentional and not accidental. *Id.* Our question on review, then, is whether, viewing the evidence in the light most favorable to the State, there was sufficient evidence to prove that defendant intended to cause bodily harm to Reich or to make physical contact of an insulting or provoking nature with her. We find that there was not.

¶ 20 Here, the evidence, even when viewed in the light most favorable to the State, does not show that defendant intended to hit Reich, and thus, he did not commit aggravated battery of a nurse. Intent, such as knowingness, may be proven by circumstantial evidence and inferred from the defendant's action and the conduct surrounding it. *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009).

¶ 21 The circumstantial evidence in this case and defendant's conduct on the evening in question do not support the inference that defendant intended to strike Reich. The record shows that defendant, a diagnosed schizophrenic, had been a patient at Illinois Masonic since 2006. Defendant testified that he was familiar with the staff at Illinois Masonic, respected them, and credited them with saving his life "so many times." On the evening in question, defendant was in distress because, earlier that day, he learned that both his partner and son were in a car accident and that his son did not survive the accident. This news caused defendant to attempt suicide by overdosing on prescription medication, which ultimately led to him being treated at Illinois Masonic that evening. Not surprisingly, when defendant was admitted to the emergency room, he was behaving turbulently and yelling indiscriminately. When Reich attempted to remove the cross, he refused and explained that it had been a gift from his partner. Reich nevertheless attempted to remove the necklace, and he inadvertently struck her with it. He testified that he could not recall certain parts of his encounter with Reich. Again, this is not surprising given that defendant had attempted to commit suicide by ingesting prescription medication. When all of this evidence is considered as a whole, it does not show that defendant had the requisite intent to cause bodily harm to Reich or to make physical contact of an insulting or provoking nature with her.

¶ 22 In contrast, the State provided insufficient evidence that defendant had the requisite intent to cause bodily harm to Reich or to make physical contact of an insulting or provoking nature with her. Reich, according to all of the testimony, is the one who initiated the struggle with defendant, a diagnosed schizophrenic whose mental health history she was familiar with, by forcibly removing his necklace over his clear objection. As a patient, defendant had a common-law right to refuse medical treatment. *In re Estate of Longeway*, 133 Ill. 2d 33, 45 (1989). At some point during that brief altercation, the cross came into contact with Reich. It was the State's burden to prove, as an essential element, that defendant's conduct was knowing or intentional and not accidental. See *Robinson*, 379 Ill. App. 3d at 684-85. Defendant tried to explain to Reich that the necklace was a gift with sentimental value. When she persisted in trying to remove it, he reached his hand up to prevent her from taking it. He was clutching the cross in his hand. This is all confirmed by the State's witnesses. Both nurses testified that there was an altercation, which Reich initiated, and that they saw defendant's arm move briefly toward Reich during the struggle. But defendant does not dispute that the cross made contract with Reich; rather, he contends he never intended that outcome. Nothing in the State's evidence suggests otherwise. It was the State's burden to prove that he was "consciously aware" of what he was doing and the results of his actions. Given the defendant's mental state at the time, we find that the State's evidence establishing defendant's intent was so unsatisfactory as to create reasonable doubt of his guilt. Accordingly, the evidence was insufficient to support his conviction.

¶ 23 For these reasons, we reverse the judgment of the circuit court of Cook County.

¶ 24 Reversed.

¶ 25 JUSTICE HYMAN, specially concurring:

¶ 26 I agree with my colleagues that Lee's conviction should be reversed, as the evidence did not establish he intended to harm nurse Emily Reich or make contact of an insulting or provoking nature. I write separately to express my concerns regarding (1) the need to honor the decisions of competent patients, like Lee, to limit consent to medical treatment and (2) the tendency to criminalize the behavior of people who suffer from a mental illness.

¶ 27 Consent to medical treatment is a fundamental safeguard for patient autonomy. Evelyn M. Tenenbaum, *Revitalizing Informed Consent and Protecting Patient Autonomy: An Appeal to Abandon Objective Causation*, 64 Okla. L. Rev. 697, 718 (2012) ("The purpose of informed consent laws is to ensure that patient autonomy is respected—that the patient's personal preferences, values, and goals are given deference and that the choice of medical care is ultimately the patient's alone."). It is not unconditional. A patient has the right to consent to some types of treatment but not others or to consent to treatment for a period of time and then withdraw consent. A patient's putting on a hospital gown and consenting to having his or her vital signs taken and blood drawn does not presuppose consent to every treatment protocol or every request of every doctor and every nurse.

¶ 28 A patient's consent to the collection of his or her blood for laboratory testing does not connote consent to donate blood. Nor does past consent imply present or future consent. A competent patient has ongoing choices and rights, and the granting of consent, like the granting of a license, has its own limits and conditions. Douglas Andrew Grimm, *Informed Consent for All! No Exceptions*, 37 N.M. L. Rev. 39, 48 (2007) (providing an overview of

informed consent and noting that "[o]ne of the primary issues in dealing with informed consent is that the scope of the patient's consent may be limited").

¶ 29 Lee contends he was exercising his right to withhold consent to medical treatment that would require him to remove his cross and, thus, was justified in using force against Reich. Lee's actions were prompt, definite, and pointed; he was refusing the nurses' request that he take off the necklace. Lee's condition did not interfere with his capacity to consent, refuse consent, or withdraw consent. While his assertion that he was justified in using force in exercising his right to refuse treatment cannot be condoned, what occurred was not only preventable but predictable considering that the nurses were dealing with a mentally ill patient.

¶ 30 I would contend, however, that this prosecution should not have been brought and that similar cases might be avoided by more critical consideration of a person's mental condition and intent before charges are filed.

¶ 31 Individuals with psychiatric or mental health conditions are regularly mistreated and undertreated in the criminal justice system. Jamie Fellner, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 Harv. Civ. Rts.-Civ. Liberties L. Rev. 391 (2006) (describing the sources and effects of this tension between prisons and mental illness). Although mental illness is not as directly related to criminal involvement or violence as is often assumed, individuals with mental illness are nonetheless disproportionately present in jails and prisons. Edward P. Mulvey & Carol A. Schubert, *Mentally Ill Individuals in Jails and Prisons*, 46 Crime & Just. 231 (2017) (noting that the prevalence rate of serious mental disorders among jail inmates is somewhere between three and six times that in general population). This overrepresentation indicates a tendency to criminalize the behavior of mentally ill people. Daniela Peterka-Benton & Brian Paul Masciadrelli, *Legitimacy of Corrections as a Mental Health Care Provider: Perspectives From U.S. and European Systems*, 2013 J. Inst. Just. Int'l Stud. 171. Indeed, due to a number of factors, including deinstitutionalization and the inadequacy of community-based psychiatric services, people with mental illnesses are arrested for minor offenses that would formerly have been seen as requiring medical attention but are now seen as behaviors that require punishment through the criminal system. Jennifer L. Skeem, Sarah Manchak, & Jillian K. Peterson, *Correctional Policy for Offenders with Mental Illness: Creating a New Paradigm for Recidivism Reduction*, 35 Law & Hum. Behav. 110, 111 (2011) ("the nation's jails and prisons have become, *de facto*, the nation's largest psychiatric hospitals" (internal quotation marks omitted)).

¶ 32 In recent years, efforts have been made to better serve the needs of the mentally ill in the legal system, including the implementation of specialty mental health, drug, and veterans treatment courts and diversion programs. But prosecutors must continue to look more deeply and sensibly at cases involving the mentally ill to determine whether charges should be brought. Lee, who was distraught and suicidal, voluntarily sought help at a hospital. Despite having Lee's best interests in mind, Reich, by physically trying to remove Lee's necklace against his wishes, instigated as well as exacerbated the confrontation. To be sure, of paramount importance is the safety of medical personnel who work with patients exhibiting erratic and dangerous behavior. But rarely should unwanted physical contact between mentally ill patients and hospital staff amount to conduct worthy of a criminal charge. By carefully considering the intent of the patient before bringing charges, prosecutors may avoid unnecessary prosecutions and curtail the incarceration of those with mental illnesses.