2022 IL App (4th) 210507

NO. 4-21-0507

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| KYLIE TAYLOR, | ) | No. 20CF269 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mark S. Goodwin, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice Cavanagh concurred in the judgment and opinion.
Justice Steigmann dissented, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Kylie Taylor, was found guilty of two counts of

aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2020)). The trial court sentenced

defendant to 24 months' probation. Defendant appeals, arguing that the State presented

insufficient evidence to convict her of either count of aggravated battery. Defendant also argues

that the trial court conducted an inadequate inquiry of potential jurors pursuant to Illinois

Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm in part and reverse in part.

¶ 2                                     I. BACKGROUND

¶ 3    In April 2020, defendant was charged with two counts of aggravated battery

against a peace officer (720 ILCS 5/12-3.05(d)(4)(i) (West 2020)) (counts I and II), one count of

resisting or obstructing a peace officer (720 ILCS 5/31-1(a) (West 2020)) (count III), and two

counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2020)) (counts IV and V). The charges arose out of events occurring on April 26, 2020, in which defendant ran from police officers who were responding to a domestic dispute and deliberately coughed at them to infect them with COVID-19 while they arrested her. Ultimately, the State proceeded only on counts I and II, which alleged aggravated battery against Officers Tyler Starkey and Jacob Troglia, respectively.

¶ 4    Defendant's jury trial commenced on July 7, 2021. During jury selection, the court asked the prospective jurors (1) "can you accept that the defendant's presumed innocent of the charge[s]," (2) "can you accept the proposition that before a defendant can be convicted, the State must prove the defendant's guilt beyond a reasonable doubt," (3) "can you accept the proposition that the defendant is not required to offer any evidence on her own behalf," and (4) "should the defendant choose not to testify ***, can you accept the proposition that that cannot be held against her?" Every prospective juror answered "Yes" to each question.

¶ 5    Following jury selection, Starkey testified to the following. Starkey was a patrol officer for the Danville Police Department. On April 26, 2020, he was on duty and wearing a police uniform. That day, he, Troglia, and Officer Ryan Elmore received a domestic disturbance call at an apartment at 2320 North Vermilion Street in Danville. Once the officers arrived, they encountered defendant; defendant's girlfriend, Alyssa Rahm; and defendant's mother, Danielle Taylor (Taylor). The apartment was "full of yelling," so Starkey spoke with Rahm in the hallway outside the apartment. According to Starkey, Rahm told him that Taylor threatened to kill or shoot her. As a result, the officers arrested Taylor. While the officers did so, defendant was angry and hostile. Starkey testified that defendant was "cussing" and "asking, 'Do you have a warrant?' and all of that kind of jazz." Defendant then told Rahm, "I'm going to kill you." Starkey testified

2

that one of the officers asked defendant "if she really said that," and defendant responded that she was " 'just joking.' "

¶ 6    Starkey explained that he and Troglia approached defendant to arrest her. As they did so, defendant ran to a bedroom in the back of the apartment, and Starkey and Troglia followed. Defendant shut the bedroom door, but Starkey pushed it open. Starkey and Troglia grabbed defendant and handcuffed her. Starkey explained that, at that point, he was standing on one side of defendant while Troglia stood on the other side. Rahm entered the bedroom and tried to calm defendant down, but defendant spit in her face.

¶ 7    Starkey testified that defendant then turned her head "to her left and to her right" and started coughing at him and Troglia, respectively. Starkey testified that he "felt a moisture on [his] arm" when defendant did so. The prosecutor asked Starkey if the moisture he felt was "spittle, so to speak," and Starkey responded, "Yes, in a sense." Starkey explained that defendant had not coughed prior to that point. According to Starkey, defendant could have avoided coughing on them, and it "wasn't like a cough that you were trying to clear a throat" but was "more of like trying to cough on somebody." Starkey testified that defendant then stated that she was under quarantine for COVID-19 and said, "I hope you f*** get it too." Starkey noted that he was frightened after defendant coughed at him because he feared he would contract COVID-19. He explained that this "was around the time COVID first was happening," and "[n]obody knew anything about it." Starkey testified that, after defendant coughed on him and Troglia, they walked defendant to a squad car, placed her in the back seat, and drove to the police station. During the ride, defendant was screaming and spit on the back of the clear cage in the squad car.

¶ 8    Starkey acknowledged that he did not mention in his report either that he felt "mist" on his arm or that defendant was screaming and spitting in the back seat of the squad car.

3

Starkey explained that at the time of the incident, it was only his third month at the police department. He stated that he did not mention "mist or the spittle" in his report because he was trying to provide a synopsis of what transpired, and he "didn't think that specific detail was supposed to be in the report." He noted that Troglia's report did mention that defendant had spit in the squad car.

¶ 9 The State then called Troglia, who testified to the following. Troglia was a patrol officer with the Danville Police Department and was one of the officers who responded to 2320 North Vermilion Street on April 26, 2020. Troglia was on duty and in uniform. Troglia explained that when he, Starkey, and Elmore arrived, there was "a lot of arguing *** over property," and they determined that probable cause existed to arrest "the mother." While Elmore arrested the mother, Troglia was waiting for Rahm to get her property and leave when defendant stated, "If she stays here tonight, I'm going to kill her." Troglia testified that, after one of the officers asked defendant if she, in fact, made that threat, defendant responded that she " 'was kidding.' " Troglia then told her that "she was going to be arrested for disorderly conduct." Defendant ran to a bedroom. As Troglia and Starkey followed her, defendant "slammed" the door. Troglia and Starkey entered the bedroom and attempted to handcuff defendant, but defendant resisted. Troglia explained that he and Starkey were on opposite sides of defendant as they tried to restrain her.

¶ 10 According to Troglia, after placing defendant in handcuffs, defendant stated that she was under quarantine for COVID-19 and started coughing in both Starkey's and Troglia's directions. Defendant then stated, "I hope you f*** get it too." Troglia testified that defendant's cough was a deep and voluntary one, and he "could feel the heat of her breath on [his] face." Troglia explained that defendant had not coughed or showed any difficulty breathing prior to that

4

point. Thereafter, Troglia and Starkey escorted defendant to their squad car and transported her to jail. Troglia explained that, when they arrived, he got defendant out of the squad car and saw "spit all over" the cage, floorboard, and seat. Defendant then stated, "I hope all of you officers get COVID after cleaning up the spit." Troglia testified that he was "very concerned because we knew nothing about COVID at that time other than it was contagious and people were going to the hospitals for it." Troglia acknowledged that he did not include anything in his report about feeling warm breath from defendant when she coughed toward him. However, he included in his report that defendant coughed on him and Starkey.

¶ 11    Defendant presented no evidence, and following closing arguments, the jury found defendant guilty of both counts of aggravated battery. The trial court sentenced defendant to 24 months' probation on both counts, running concurrently. This appeal followed.

¶ 12                                II. ANALYSIS

¶ 13                        A. Sufficiency of the Evidence

¶ 14    Defendant first argues that her aggravated battery convictions must be reversed because the State presented insufficient evidence to convict her of those offenses. Defendant does not dispute that she was aware that Starkey and Troglia were police officers performing their official duties when the offenses occurred or that her actions were insulting or provoking. Instead, defendant asserts that the State failed to prove that she knowingly made physical contact with either Starkey or Troglia.

¶ 15    When a defendant challenges the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 19 (opinion of Neville, J., joined by Burke, J.). It is the responsibility

5

of the trier of fact to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Murray*, 2019 IL 123289, ¶ 19. Accordingly, we will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Murray*, 2019 IL 123289, ¶ 19. Even so, the determinations of the trier of fact are not conclusive, and a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Murray*, 2019 IL 123289, ¶ 19.

¶ 16        Section 12-3.05(d)(4)(i) of the Criminal Code of 2012 provides, in part:

"A person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be *** [a] peace officer *** performing his or her official duties." 720 ILCS 5/12-3.05(d)(4)(i) (West 2020).

Section 12-3(a)(2) provides, *inter alia*, that to establish that a defendant committed battery, the State must show that "he or she knowingly without legal justification by any means *** [made] physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a)(2) (West 2020).

¶ 17        Defendant contends that the evidence was insufficient to convict her of aggravated battery because the State failed to prove that she committed battery. Specifically, defendant argues that (1) her coughing toward Starkey and Troglia did not constitute physical contact with either officer and (2) the evidence did not demonstrate that her conduct was knowing. The State responds that Starkey's testimony that he felt spittle and Troglia's testimony that he felt defendant's breath satisfied the physical contact elements. The State further responds

6

that defendant's intent was established by her actions and her comment that she hoped the officers contracted COVID-19.

¶ 18    Knowingly or intentionally spitting on a police officer is physical contact of an insulting or provoking nature. *People v. Peck*, 260 Ill. App. 3d 812, 814-15 (1994). Indeed, spitting has been recognized as an act sufficient to support a battery conviction since the development of early common law. *Peck*, 260 Ill. App. 3d at 814.

¶ 19    *Peck* is instructive. In *Peck*, officers responded to a disturbance at the defendant's residence. *Peck*, 260 Ill. App. 3d at 813. While the officers spoke with the defendant, the defendant was belligerent and spit on one officer's face. *Peck*, 260 Ill. App. 3d at 813. The officers arrested the defendant, and he was charged with, *inter alia*, aggravated battery. *Peck*, 260 Ill. App. 3d at 812-13. The jury found the defendant guilty, and the defendant appealed, arguing that mere spitting was not "physical contact" that could sustain an aggravated battery conviction. *Peck*, 260 Ill. App. 3d at 813-14. We rejected that argument. *Peck*, 260 Ill. App. 3d at 813. We explained that, per section 12-3(a), one commits a battery if he or she makes physical contact with the victim " 'by any means,' " and we noted that spitting had long been recognized as an act that could constitute battery. *Peck*, 260 Ill. App. 3d at 814 (quoting 720 ILCS 5/12-3(a) (West 1992)). Thus, we held that spitting in the face of the officer "easily" constituted physical contact of an insulting or provoking nature to meet the definition of battery under section 12-3(a)(2) (720 ILCS 5/12-3(a)(2) (West 1992)). *Peck*, 260 Ill. App. 3d at 815.

¶ 20    As in *Peck*, we hold that the State presented sufficient evidence that defendant made physical contact with Starkey. Starkey testified that, while he attempted to restrain defendant, defendant turned her head toward him and started coughing at him. He further testified that, when defendant did so, he "felt a moisture on [his] arm" and acknowledged that the

7

moisture was "spittle." Like *Peck*, defendant's coughing on Starkey such that spittle contacted his arm constituted physical contact and supported a conviction for battery.

¶ 21    Defendant responds that *Peck* is distinguishable because she did not engage in the literal act of spitting at the officers like the defendant in *Peck* but merely coughed at them. This distinction is baseless. As we recognized in *Peck*, "[t]he language of the battery statute clearly provides that a battery can be committed if the accused has contact with the victim 'by any means.' " *Peck*, 260 Ill. App. 3d at 814 (quoting 720 ILCS 5/12-3(a) (West 1992)). Here, the evidence showed that Starkey felt spittle when defendant coughed at him, and such contact was sufficient to constitute "physical contact" under section 12-3(a)(2). Defendant also contends that Starkey's testimony was "equivocal at best" because he testified that the moisture on his arm was spittle "in a sense," and he did not mention this fact in his report. However, it is the province of the trier of fact to weigh the evidence and judge the credibility of the witnesses, and we will not substitute our judgment for the jury's on those determinations. *Murray*, 2019 IL 123289, ¶ 19 (opinion of Neville, J., joined by Burke, J.).

¶ 22    We also hold that the State presented sufficient evidence that defendant's conduct as to Starkey was knowing. A person acts knowingly when he or she is consciously aware that his or her conduct is practically certain to cause the result. *People v. Dorsey*, 2016 IL App (4th) 140734, ¶ 34. Intent is rarely proved by direct evidence because it is a mental state, and thus, it may be proven by circumstantial evidence. *Dorsey*, 2016 IL App (4th) 140734, ¶ 34. Accordingly, intent may be inferred from surrounding circumstances and the character of the defendant's acts. *Dorsey*, 2016 IL App (4th) 140734, ¶ 34.

¶ 23    Defendant relies on *People v. Lee*, 2017 IL App (1st) 151652, to argue that the evidence does not show that she had the requisite intent to make physical contact with Starkey.

8

In *Lee*, the defendant was charged with aggravated battery of a nurse. *Lee*, 2017 IL App (1st) 151652, ¶ 2. The trial evidence showed that the defendant, a diagnosed schizophrenic, was in the hospital after attempting to overdose on prescription medication upon learning that his partner and son were in a car accident and that his son had not survived. *Lee*, 2017 IL App (1st) 151652, ¶¶ 3, 10. The defendant was yelling abusively. *Lee*, 2017 IL App (1st) 151652, ¶ 3. A nurse noticed that the defendant was wearing a necklace with a metal cross and, pursuant to hospital protocol, told the defendant that she needed to take it from him. *Lee*, 2017 IL App (1st) 151652, ¶ 4. The defendant refused, claiming that it was a gift from his partner, but the nurse approached the defendant and leaned over him to remove the necklace. *Lee*, 2017 IL App (1st) 151652, ¶¶ 4, 11. The defendant clutched the cross in his hand and pulled away, and as he did so, he hit the nurse in the forehead with the cross. *Lee*, 2017 IL App (1st) 151652, ¶ 4. The trial court found the defendant guilty of aggravated battery. *Lee*, 2017 IL App (1st) 151652, ¶ 14.

¶ 24        The defendant appealed, arguing that the State failed to prove that he intended to cause bodily harm to the nurse or to make physical contact of an insulting or provoking nature with her. *Lee*, 2017 IL App (1st) 151652, ¶ 19. The appellate court agreed, reasoning that the circumstantial evidence did not support the inference that the defendant intended to strike the nurse. *Lee*, 2017 IL App (1st) 151652, ¶ 21. The court explained that the evidence showed that the defendant was in distress after he learned that his son had passed away, and although he refused the nurse's request to remove the cross, she attempted to remove it anyway, causing the defendant to strike her inadvertently. *Lee*, 2017 IL App (1st) 151652, ¶ 21. The court noted that the nurse was "the one who initiated the struggle with defendant," whom she knew was a diagnosed schizophrenic, "by forcibly removing his necklace over his clear objection" even though the "defendant had a common-law right to refuse medical treatment." *Lee*, 2017 IL App

(1st) 151652, ¶ 22. Accordingly, the court reversed the defendant's conviction of aggravated battery. *Lee*, 2017 IL App (1st) 151652, ¶ 23.

¶ 25        *Lee* is distinguishable. Unlike *Lee*, defendant was not a patient exercising a common-law right to refuse medical treatment. Moreover, Starkey did not cause defendant to cough involuntarily. Instead, the evidence supported a conclusion that defendant deliberately turned her head toward Starkey and coughed at him, then stated that she hoped he contracted COVID-19. Accordingly, defendant's reliance on *Lee* is unavailing.

¶ 26        Instead, we conclude that defendant's knowledge may be inferred from the context and the act itself of coughing on Starkey. Starkey testified that before defendant was arrested, she was angry and hostile in that she was "cussing" and asking if the officers had a warrant. Starkey and Troglia both explained that, once the officers decided to arrest defendant, she ran to a bedroom. Starkey noted that after entering the bedroom, and while handcuffing defendant, defendant spit in Rahm's face. Starkey and Troglia noted that defendant then turned toward both of them and coughed. Starkey explained that he and Troglia stood on opposite sides of defendant, so she could have avoided coughing on them. Starkey testified that he felt spittle on his arm when defendant coughed at him, and Troglia noted that he felt the heat of her breath on his face when she coughed at him. Starkey and Troglia explained that defendant had not coughed prior to that point. Additionally, Starkey testified that defendant's cough was not indicative of simply trying to clear her throat but rather "trying to cough on somebody." Similarly, Troglia testified that defendant's cough was a deep, voluntary one. Both officers noted that defendant then stated that she was under quarantine for COVID-19 and said, "I hope you f*** get it too." Viewing this evidence in the light most favorable to the State, a rational trier of fact could reasonably infer that defendant acted knowingly when she coughed at Starkey.

10

¶ 27    Defendant responds that any spittle that landed on Starkey should be considered only reckless contact because she was not "necessarily aware" that her coughing would lead to physical contact. However, the jury was in the best position to assess the evidence, determine its weight, and resolve any inconsistencies or conflicts therein. *Murray*, 2019 IL 123289, ¶ 19 (opinion of Neville, J., joined by Burke, J.). The jury, having considered this evidence, clearly determined that defendant's contact with Starkey was at least knowing conduct, and we defer to that determination.

¶ 28    Accordingly, we hold that, viewing the evidence in the light most favorable to the prosecution, the jury could have found the essential elements of the offense of aggravated battery against Starkey beyond a reasonable doubt.

¶ 29    However, we hold that the evidence was insufficient to sustain defendant's conviction of aggravated battery against Troglia because the State failed to present sufficient evidence that defendant made physical contact with him. Troglia testified only that, when defendant coughed at him, he "could feel the heat of her breath on my face." Unlike Starkey, Troglia did not testify that he felt spittle, and the State has provided no authority suggesting that breath is physical contact under section 12-3(a)(2). The State asserts that the jury could make "a reasonable inference *** that the defendant's hot breath contained moisture *** in the form of droplets." However, a reasonable inference under the law requires a chain of factual evidentiary antecedents, and absent such a chain, the alleged inference is not a reasonable one but is, instead, mere speculation. *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 32. Here, the jury heard no evidence that an individual's breath contains moisture or droplets. As such, there was no evidentiary basis for the jury to conclude that defendant made contact with Troglia through moisture in her cough. See *People v. Carter*, 2021 IL 125954, ¶ 42 ("A reviewing court's

obligation to view the evidence in the light most favorable to the prosecution does not mean that the reviewing court construes the record to contain evidence that the State failed to produce."). Absent evidence to establish that defendant made physical contact with Troglia by coughing at him, the evidence was insufficient to convict defendant of aggravated battery against Troglia.

¶ 30                                    B. Inadequate Rule 431(b) Inquiry

¶ 31            Next, defendant argues that the trial court's inquiry of potential jurors failed to comply with Rule 431(b). Specifically, defendant asserts that the trial court did not ask whether the jurors understood the principles set forth in Rule 431(b). Defendant acknowledges that she did not preserve this issue for appeal, but she argues that she is warranted relief under the first prong of the plain-error doctrine because the evidence at trial was closely balanced. The State responds that the evidence was not closely balanced.

¶ 32            Defendant forfeited this issue because she did not contemporaneously object to the trial court's failure to comply with Rule 431(b) or include the issue in a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 47. However, a defendant may nevertheless obtain relief pursuant to the plain-error doctrine in either of two circumstances. The defendant may show that a clear or obvious error occurred and that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Belknap*, 2014 IL 117094, ¶ 48. Alternatively, the defendant may show that a clear or obvious error occurred and that the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Belknap*, 2014 IL 117094, ¶ 48. While a "clear" Rule 431(b) violation is cognizable under the first prong of the plain-error doctrine, it is not cognizable under the second prong absent evidence that the violation produced a biased jury. *People v. Sebby*, 2017 IL

12

119445, ¶¶ 52, 72. Here, defendant invokes the first prong, arguing that the evidence was closely balanced. The first step is to consider whether error occurred. *People v. Wilmington*, 2013 IL 112938, ¶ 31.

¶ 33        Rule 431(b) provides, *inter alia*, that the "court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" that (1) the defendant is presumed innocent of the charges against her, (2) the State must prove the defendant guilty beyond a reasonable doubt, (3) the defendant is not required to offer evidence on her own behalf, and (4) if the defendant chooses not to testify, it cannot be held against her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Thus, under Rule 431(b), the trial court must "ask potential jurors whether they *understand* and *accept* the enumerated principles, mandating 'a specific question and response process.' " (Emphases in original.) *Wilmington*, 2013 IL 112938, ¶ 32 (quoting *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)).

¶ 34        Here, the trial court committed a clear or obvious error in that it failed to comply with Rule 431(b). The record establishes that the trial court asked only whether the jurors accepted each principle and not whether the jurors understood them. The trial court's failure to ask jurors if they understand the Rule 431(b) principles is "error in and of itself." *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 35        Thus, we must consider whether the evidence was closely balanced such that defendant's remaining conviction of aggravated battery against Starkey must be reversed and remanded for a new trial. In determining whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case. *Sebby*, 2017 IL 119445, ¶ 53. This requires assessment of the evidence on the elements of the charged offense, along with any evidence regarding the

witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53. Whether the evidence was closely balanced depends upon the quantum of evidence the State presented against the defendant. *People v. Moore*, 2020 IL App (1st) 182535, ¶ 22.

¶ 36　　　　　We conclude that the evidence of defendant's aggravated battery against Starkey was not closely balanced. The unrebutted evidence established that Starkey and Troglia were on-duty and wearing their uniforms when they arrived at the apartment. Upon their arrival, defendant was angry and hostile. Defendant was "cussing" at the officers. After Troglia told defendant that he was placing defendant under arrest, defendant ran. After the officers restrained defendant, defendant spit in Rahm's face. Starkey and Troglia testified that defendant then turned toward them and coughed at both of them despite having the ability to avoid doing so. Starkey testified that he felt "moisture" on his arm and agreed that it was "spittle." Defendant then informed the officers that she was under quarantine for COVID-19 and told the officers "I hope you f*** get it too."

¶ 37　　　　　We note that defendant asks us to "reconsider" our decision in *People v. Ely*, 2018 IL App (4th) 150906, ¶ 17, in which we held that first prong plain-error review requires not only closely balanced evidence, but also proof of prejudice that results from the clear or obvious error. Defendant argues that *Ely* conflicts with *Sebby*, 2017 IL 119445, ¶ 69, in which our supreme court noted that the "only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced." However, because we conclude that the evidence was not closely balanced, we need not address defendant's request to reconsider *Ely*.

¶ 38　　　　　Accordingly, because the evidence pertaining to defendant's conviction for aggravated battery against Starkey was not closely balanced, we hold that defendant is not entitled to relief under the first prong of the plain-error doctrine.

¶ 39                                    III. CONCLUSION

¶ 40            For the reasons stated, we affirm defendant's conviction, in count I, of aggravated

battery against Starkey and reverse defendant's conviction, in count II, of aggravated battery

against Troglia.

¶ 41            Affirmed in part and reversed in part.

¶ 42            JUSTICE STEIGMANN, dissenting:

¶ 43            I completely understand the conclusion of my distinguished colleagues in the

majority that the State failed to prove defendant committed an aggravated battery against Officer

Troglia because the State failed to present sufficient evidence that defendant made physical

contact with him. After all, the only "contact" by defendant about which Troglia testified was

that she coughed and breathed on him, and I am aware that there is no case which has held that

coughing or breathing upon another constitutes physical contact within the meaning of section

12-3(a)(2) of the Criminal Code of 2012 defining the offense of battery (720 ILCS 5/12-3(a)(2)

(West 2020)).

¶ 44            However, context matters. In my opinion, the context of what defendant did, how

she did it, and her stated reasons for doing it all compel the conclusion that the evidence was

sufficient to sustain defendant's conviction of aggravated battery against Troglia. Accordingly, I

respectfully dissent.

¶ 45                        I. THE CHARGE AGAINST DEFENDANT

¶ 46            The trial court instructed the jury that to prove the charge of aggravated battery to

a peace officer, the State needed to prove beyond a reasonable doubt the following propositions:

(1) defendant "knowingly *** by any means *** [made] physical contact of an insulting or

provoking nature with" the officers (*id.*); (2) at the time defendant did so, she knew them to be

15

peace officers; and (3) she knew the officers were performing their official duties. See 720 ILCS 5/12-3.05(d)(4)(i) (West 2020).

¶ 47 On appeal, defendant does not contest the second or third of these propositions. Further, she does not contest that her actions were of an insulting or provoking nature to the officers. Instead, defendant's sole contention regarding the charge of aggravated battery to Troglia is whether, under the facts of this case, the jury could find that she made "physical contact" with that officer. Specifically, defendant contends—and the majority agrees—that "the evidence was insufficient to sustain defendant's conviction of aggravated battery against Troglia because the State failed to present sufficient evidence that defendant made physical contact with him." *Supra*, ¶ 29. I respectfully disagree.

¶ 48 II. THE ISSUE OF "PHYSICAL CONTACT"

¶ 49 On the issue of physical contact, the majority appropriately cites *Peck*, a decision this court wrote almost 30 years ago, in which we rejected the defendant's argument that "mere" spitting on another cannot amount to insulting or provoking contact. *People v. Peck*, 260 Ill. App. 3d 812, 814 (1994). In so concluding, we wrote the following: "[t]he language of the battery statute clearly provides that a battery can be committed if the accused has contact with the victim '*by any means*.' (720 ILCS 5/12-3(a) (West 1992).)" (Emphasis added.) *Id.* This court also wrote the following in *Peck*: "[r]egarding the insulting or provoking nature of spitting on another, we note that 'a particular physical contact may be deemed insulting or provoking based upon the factual context in which it occurs.' " *Id.* (quoting *People v. d'Avis*, 250 Ill. App. 3d 649, 651 (1993)).

¶ 50 Ultimately, we concluded as follows:

16

"Although we can envision contexts in which a defendant's spitting might not constitute insulting or provoking behavior, defendant's spitting in the face of a police officer in this case clearly amounts to insulting or provoking contact. [Citation.] We hold that defendant's conduct easily reached 'physical contact of an insulting or provoking nature' within the meaning of section 12–3(a)(2) of the Code (720 ILCS 5/12-3(a)(2) (West 1992))." *Id.* at 814-15.

¶ 51　Defendant's breathing and coughing upon Troglia in this case may not be enough to permit us to *easily* conclude that it constituted "physical contact," as did the spitting in *Peck*, but I conclude that defendant's conduct met that description when properly considered in context.

¶ 52　In so concluding, I emphasize the phrase "by any means" in the instructions the jury received in this case. The jury on this evidence concluded that the State had proved beyond a reasonable doubt that defendant's breathing and coughing on Troglia constituted physical contact of an insulting and provoking nature *by any means*.

¶ 53　The majority's rejection of the jury's verdict does not appear to be based on its conclusion that the evidence was conflicting or inadequate about whether defendant coughed and breathed upon Troglia; instead, the majority's rejection of the jury's verdict appears to be based on its conclusion that defendant's coughing and breathing upon Troglia cannot, *as a matter of law*, be sufficient to establish physical contact by any means.

¶ 54　In *People v. DeRosario*, 397 Ill. App. 3d 332, 333-35 (2009), the Second District Appellate Court addressed the defendant's claim on appeal that he was improperly convicted of battery because the evidence did not prove beyond a reasonable doubt that he knowingly touched the victim in an insulting or provoking manner. The Second District noted that "[g]enerally,

17

where a defendant challenges on appeal the sufficiency of the evidence, we ask only whether, after viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt." *Id.* at 333. The Second District ultimately rejected the defendant's challenge to his conviction and cited what this court wrote in *Peck*—namely, "a particular physical contact may be deemed insulting or provoking based upon the factual context in which it occurs." (Internal quotation marks omitted.) *Id.*

¶ 55　　Interestingly, the Second District in *DeRosario* added the following observation:

"There are surprisingly few cases interpreting the insulting-or-provoking-contact provision. We acknowledge that the majority of cases have involved more violent contact than that at issue here. [Citations.] However, the statute's plain language defines the offense in terms of contact that insults or provokes the victim, not contact that injures the victim. [Citation.]

Cases support the State's position that contact that does not injure the victim can be insulting or provoking depending on the context." *Id.* at 334.

¶ 56　　In another battery case before the Second District Appellate Court, *People v. Ward*, 2021 IL App (2d) 190243 (Zenoff, J., concurring in part and dissenting in part), our distinguished colleague, Justice Zenoff, wrote a dissent that, in part, discussed the term "context" as follows: " 'Context' means the 'interrelated conditions in which something exists or occurs.' Merriam-Webster Third New World Dictionary 492 (1993). *** '[I]nterrelated conditions' may include both subjective and objective factors." *Id*. ¶ 96. I agree with Justice Zenoff's discussion of the term "context," and I think that discussion helps explain why defendant's breathing and coughing in the face of Troglia constitutes aggravated battery in this case.

18

¶ 57                  III. THE SPECIFICS OF DEFENDANT'S CONDUCT

¶ 58          Starkey testified that as he was attempting to arrest defendant, she turned her head toward him and Troglia and started coughing. He added that "it wasn't like a cough that you were trying to clear a throat. It was more of like a trying to cough on somebody." He stated that "she turned her head and coughed onto us. Like I felt a moisture on my arm." He also testified that based on his positioning, nothing would have stopped defendant from facing straight forward while coughing or avoiding his direction or Troglia's direction. Starkey said it would be fair to call the moisture on his arm from the cough "spittle."

¶ 59          Starkey also testified that after defendant coughed on him, she said she had been placed on a 14-day quarantine for the COVID-19 virus from her work and added, "I hope you fuckers get it, too." Starkey noted that this arrest occurred "around the time COVID first was happening," and "[n]obody knew anything about it." As a result, he felt frightened.

¶ 60          Troglia testified similarly, explaining that as they finally got defendant in handcuffs, she immediately said that she was under quarantine for COVID-19 and she "started coughing in both of our directions." Prior to her making that statement and coughing in the direction of the officers, she had not previously coughed.

¶ 61          Troglia was then asked to describe the manner in which defendant turned and coughed on him and Starkey, and Troglia testified as follows: "It was a deep cough. I could feel the heat of her breath on my face." He added that it appeared to him that it was a "voluntary, intentional projected cough, not an involuntary cough." Troglia also testified that after defendant made the comment about her being under quarantine for COVID-19, defendant said, "I hope you fuckers get it, too." Troglia testified that he was very concerned about what defendant said

19

"because we knew nothing about COVID at that time other than it was contagious and people were going to the hospitals for it."

¶ 62                           IV. PHYSICAL CONTACT IN THIS CASE

¶ 63          The majority concludes that defendant's coughing on Troglia and breathing into his face so closely that he "could feel the heat of her breath" on his face was not sufficient evidence to prove that defendant made physical contact with him. This conclusion appears to be based on the fact that Troglia did not testify about moisture or spittle. However, to the extent that the presence of moisture in one's breath is necessary for the breathing or coughing on a third party to constitute physical contact, I believe Troglia's testimony was adequate.

¶ 64          The majority writes that "the jury heard no evidence that an individual's breath contains moisture or droplets." *Supra* ¶ 29 I disagree that the jury needed to hear such evidence.

¶ 65          The jury in this case was given Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014)—as are all juries in criminal cases—which, in pertinent part, states the following: "You should consider all the evidence in light of your own observations and experience in life." This "common experience" instruction was enough for the jury to conclude that one's breath contains moisture. And if defendant was coughing and breathing upon Troglia from such a close distance that he "could feel the heat of her breath" on his face, then the moisture her breath contained would not be dissipated before reaching Troglia's face unlike, for instance, if she was breathing at him from a distance of two or three feet.

¶ 66          During oral argument in this case, I noticed that defendant's counsel was wearing glasses. I suggested to him that in our common experience, people who wear glasses sometimes have occasion to take them off, breathe on them to get moisture on the glasses, and then wipe

20

them clean with a cloth or a tissue. I asked him if he had ever done so, and with commendable candor, he answered yes.

¶ 67        This anecdote simply reveals that it is common knowledge that one's breath contains moisture. Another example would be the popular portrayal in movies or TV of holding a mirror under the nose of an unconscious person to see if he is alive and breathing. If he is, the mirror will fog up because of moisture in his breath. Accordingly, to the extent the majority believes "the jury heard no evidence that an individual's breath contains moisture or droplets," (*supra* ¶ 29), the majority is mistaken. The jury heard Troglia's testimony that he felt the heat of defendant's breath. The jury could conclude from this testimony and their common experience that Troglia felt the moisture in defendant's breath, much like the warm fog of breath on glasses or a mirror.

¶ 68        Perhaps the majority would have concluded that the evidence was adequate to support defendant's conviction of aggravated battery of Troglia if the State had presented some expert testimony that—yes, indeed—(1) breath contains moisture and (2) if one breathes close enough to a third party so that the third party could feel the heat of that breath on his face, moisture would have been transmitted thereby. However, I cannot believe that expert testimony along these lines should ever be required. Indeed, I think a jury hearing an expert so testify would think the parties and the court demented for thinking the jury needed the aid of an expert to understand that fact.

¶ 69        In conclusion, regarding defendant's conduct concerning Troglia, the evidence is overwhelming that she *intended* to make physical contact with him of an insulting or provoking nature by coughing at him and breathing closely into his face, while knowing that she was on a

COVID-19 quarantine. And she succeeded. This record contains no reason why this court should

not hold her accountable for what she did.

*People v. Taylor*, 2022 IL App (4th) 210507

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Vermilion County, No. 20-CF-269; the Hon. Mark S. Goodwin, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Joshua Scanlon, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Jacqueline M. Lacy, State's Attorney, of Danville (Patrick Delfino, David J. Robinson, and James C. Majors, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |